**Charles W. BRADY, Plaintiff,**

v.

**Dr. ATTYGALA, Peter Rembulat, C/O Madrigal, and Dr. Decastro, Defendants.**

**No. CV 01–4549–CAS (SGL).**

United States District Court, C.D. California.

April 17, 2002.

---

10. Defendants combined these motions, which have been given docket number 300.

Charles W. Brady, Pro Se, California State Prison, Represa.

Susan E. Myster, Atty for Defendants, Deputy Attorney General, San Diego.

## AMENDED ORDER RE: EXHAUSTION OF ADMINISTRATIVE REMEDIES [1]

LARSON, United States Magistrate Judge.

Charles W. Brady has filed a civil rights complaint against various prison officials, claiming that while he was incarcerated at Lancaster State Prison correctional officers allowed another inmate to injure him and that prison doctors were deliberately indifferent to his medical needs in how they treated a laceration under his right eye he suffered during the fight with the other inmate. Defendants have asserted that, despite representations in his complaint, Brady failed to exhaust the administrative remedies provided by the California Department of Corrections prior to filing this action.

## BACKGROUND

Brady alleges in his complaint that on May 3, 1999, he informed prison officials that he did not want to have Darren Coleman as his cell mate because Coleman was a "gang member"; it turns out that Coleman and Brady did not get along on account of Coleman being a Muslim. (Compl. Ex. A at 2; Am. Compl. ¶ 1). On May 7, 1999, while directing inmates back to their respective cells after the morning meal, Correctional Officer Peter Rembulat observed Coleman standing in front of another inmate's cell. (Compl. Ex. A at 1). Officer Rembulat ordered Coleman back to his assigned cell. (Compl. Ex. A at 1). Coleman, allegedly in plain view of Officer Rembulat, grabbed a broom as he headed back toward his cell and broke it over his knee into two pieces. (Am. Compl. ¶ 2; Compl. Ex. A at 1). Brady was already in the cell when Coleman arrived at the door.

Correctional Officer Madrigal then purportedly opened the cell door for Coleman to enter even though he observed him carrying the broken broom sticks. (Am. Compl. ¶ 3). At no time did Officer Rembulat seek to stop Coleman before he reentered his assigned cell or to confiscate the broom sticks. (Am. Compl. ¶ 2). When he entered the cell, Coleman swung one of the broom sticks at Brady, hitting him under the right eye. Upon seeing Coleman make a striking motion with the broom handle, Officer Rembulat quickly activated his personal alarm device and ordered Coleman to get down on the ground. (Compl. Ex. A at 1–2; Am. Compl. ¶ 4). Coleman was later reassigned to a different cell in another section of the prison. (Compl. Ex. A at 2).

Brady was initially seen by Mary Hoag, a medical assistant, who determined that Brady had suffered a one-inch laceration below his right eye. (Compl. Ex. A at 2). Brady complained of dizziness, blurred vision, and pain in his eye while he was being treated by the medical assistant. (Compl. Ex. A at 7). Hoag determined that Brady required further medical treatment and sent him to the prison infirmary, where he was treated by Dr. Decastro. (Compl. Ex. A at 2; Am. Compl. ¶ 5). Dr. Decastro applied two sutures to Brady's wound and gave him some Motrin for the pain. (Am. Compl. ¶ 5; Compl. Ex. C

---

1. The Court's opinion filed March 14, 2002, is amended to take into consideration the arguments raised by defendants in their motion for reconsideration filed on April 2, 2002.

at 3). Brady alleges that at no time during this examination did Dr. Decastro provide any further treatment, such as performing a visual examination of the back of his eye or ordering that a x-ray be taken. (Am.Compl.¶ 5). When the sutures were later removed by Dr. Attygala, Brady's right eye was still swollen and his pupil was "sluggish to light." (Compl. Ex. C at 4–5). He complained to Dr. Attygala that he could no longer see out of his right eye and that he continued to feel a "sharp and throbbing" pain in his eye. (Am. Compl. ¶ 6–7; Compl. Ex. C at 4–5, 9).

Over the course of the next month Brady repeatedly demanded to be seen by an outside eye specialist. (Compl.Ex. B). When his pleas allegedly went unheeded, Brady initiated a grievance requesting that he be seen by a eye specialist. On June 24, 1999, Brady was seen by an outside ophthalmologist, who purportedly informed him that his "eye was infected," that it "could not be saved," and that "his vision could not be restored." (Am. Compl. ¶ 8; Compl. Ex. C at 10; Pl's Notice of Administrative Remedies, Ex. A–2). Brady then filed this suit.

In the process of screening Brady's complaint, *see* 42 U.S.C. § 1997e(c), the Court noted that, despite specific requirements set forth in the pre-approved civil rights complaint form prepared for inmates, Brady had failed to attach "copies of papers related to the grievance procedure." Given the discrepancies between the parties contentions regarding exhaustion and Brady's failure to produce documentation related to the exhaustion of administrative remedies, the Court issued an order on November 2, 2001, requiring Brady to file a document containing "copies of papers related to the grievance procedure and the exhaustion of administrative remedies."

Brady in response submitted a pleading captioned "Notice of Administrative Remedies." Brady asserts that after the su-

tures were removed several times he informally requested to be seen by an ophthalmologist, but that each time his request was either rebuffed or ignored by the prison medical staff. (Am.Compl.¶ 7). He then filed a formal grievance on a CDC 602 inmate appeal form contesting the treatment he received by the prison doctors and requesting that he be seen by an outside eye specialist. (Pl's Notice of Administrative Remedies at 2). The inmate appeal form was eventually forwarded to the chief medical officer for a second level response on June 24, 1999, the same day Brady was seen by an ophthalmologist. (Pl's Notice of Administrative Remedies, Ex. A–1). Brady submitted copies of his appeal form and the response thereto by the appeals coordinator to substantiate his assertion. (Notice, Ex. A1 & A2). The health care manager who conducted the second level response, Dr. Raj Sethi, granted Brady's appeal on July 2, 1999. (Pl's Notice of Administrative Remedies, Ex. A–2).

Under the section "Appeal Issue," Dr. Sethi wrote that the substance of Brady's grievance was a request that he "be taken out to the [eye] specialist." (Pl's Notice of Administrative Remedies, Ex. A–2). Dr. Sethi then noted under the section "Appeal Response" that on June 24, 1999, Brady was in fact seen by an outside ophthalmologist. (Pl's Notice of Administrative Remedies, Ex. A–2). This prompted Dr. Sethi's decision to grant Brady's appeal: "[T]his appeal is **GRANTED** in that you have been seen by a 'specialist.'" (Pl's Notice of Administrative Remedies, Ex. A–2). Brady never appealed this decision to the director for the Department of Corrections, the final arbiter of prison administrative appeals. (Decl. Linda Rianda ¶ 3).

## ANALYSIS

The Prison Litigation Reform Act of 1995 amended 42 U.S.C. § 1997e(a) to provide that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

■ There is no doubt in this case that Brady's complaint must comply with the exhaustion requirement set forth in § 1997e(a). The essence of his complaint concerns the manner in which prison officials treated his ailments or failed to protect him from fellow inmates while he was confined in prison. Such assertions necessarily touch upon "prison conditions" as they concern everyday aspects of an inmate's life in prison. *See Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) ("The PLRA's exhaustion requirement applies to all inmate suits about prison life"); *White v. Fauver*, 19 F.Supp.2d 305, 313–314 (D.N.J.1998) (noting that § 1997e(a)'s reference to "prison conditions" includes "the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison").

The real question presented is whether the granting of Brady's appeal at the second administrative level was enough to exhaust his administrative remedies when there still remained a possible appeal to the director for the Department of Corrections.

Before delving into the legal issues, some background on the operation of the prison grievance process is required. The State of California provides its inmates the right to file an administrative grievance with "any department decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." CAL. CODE REGS. tit. 15, § 3084.1(a). The grievance system, however, allows for the award of prospective relief, but not monetary damages (aside

from a nominal amount for property damage). *See Rumbles v. Hill*, 182 F.3d 1064, 1068 (9th Cir.1999). The Department of Corrections' grievance process is comprised of a four-tiered hierarchy. *See* CAL. CODE REGS. tit. 15, § 3084.5.

In order to exhaust their administrative remedies, inmates must first attempt to informally resolve the problem with the "staff involved in the action or decision being appealed." CAL. CODE REGS. tit. 15, § 3084.5(b). If unsuccessful there, inmates must then submit a formal appeal on an approved inmate appeal form to the correctional institution's appeals coordinator, *id.*, and if unsuccessful there, submit another formal appeal for a second level of review conducted by the warden or his or her designee. *See* CAL. CODE REGS. tit. 15, §§ 3084.5(c) & 3084.5(e)(1). If the warden rejects the appeal, prisoners must then submit a formal appeal to the director for the California Department of Corrections. *See* CAL. CODE REGS. tit. 15, § 3084.5(e)(2). The director's decision "shall be final and exhausts all administrative remedies available in the Department [of Corrections]." CALIFORNIA DEPARTMENT OF CORRECTIONS OPERATIONS MANUAL § 54100.11.

Defendants argue that Brady's failure to take an appeal to the director after his appeal was granted at the second level mandates a finding that he has failed to exhaust his administrative remedies. According to defendants, section 1997e(a)'s exhaustion requirement carries with it no exceptions, even when an inmate's grievance has been granted at a lower level in the administrative process. Such a hard line approach they maintain is mandated by the Supreme Court's construction of the statutory language in *Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

The Court was presented in *Booth* with the question of whether the statute's call for an inmate to exhaust "such administra-

tive remedies as are available" applied when the inmate sought only monetary damages but the prison administrative process, although providing some sort of relief, did not allow for the awarding of damages. *Id.* at 1821. The Court held that, under such circumstances, the statute required the inmate to pursue the prison administrative process "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." *Id.* at 1824.

In the course of reaching its conclusion, the Court noted that it would "not read futility or other exceptions" into section 1997e(a)'s exhaustion requirement. *Id.* at 1825 n. 6. The Court went on to hold that "an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *Id.* It is these statements in the Court's opinion that defendants argue require an inmate to continue to appeal his grievance even after winning at a lower level in the administrative process. The problem is that these statements say nothing about *when* an inmate is considered to have actually exhausted his administrative remedies. Instead, the statements merely indicate that an inmate must exhaust his remedies regardless of the relief he seeks or the relief offered by the prison grievance system. *See id.* at 1823 (explaining that the phrase "such administrative remedies as are available" requires an inmate to exhaust whatever grievance procedures are available, "whether or not the possible responses cover the specific relief the prisoner demands" in his federal complaint). One must look to another section of the Court's opinion for an answer to the question of *when* a inmate is considered to have exhausted his remedies.

 The Court noted at the outset of its opinion that its analysis was premised upon the assumption "that some redress

for a wrong is presupposed by the statute's requirement of an 'available' 'remedy.'" *Id.* at 1822. So long as there exists a "possibility of some relief for the action complained of," an available remedy still exists for the inmate to exhaust. *Id.* at 1824. To the Court it is the possibility of relief that is critical in determining *when* an inmate has exhausted his administrative remedies. "Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." *Id.* at 1822 n. 4. Further pursuit of an administrative appeal is therefore not required when no relief whatsoever is left available for the inmate to obtain through the prison administrative process. At that point, the inmate has "nothing [left] to exhaust." *Id.*

Other courts have also recognized that inmates do not need to continue to pursue administrative remedies when there is nothing left to obtain from the administrative process. The Seventh Circuit, in a hypothetical similar to the facts in this case, noted:

> It is possible to imagine cases in which the harm is done and no further administrative action could supply *any* "remedy." ... Suppose the prisoner breaks his leg and claims delay in setting the bone is cruel and unusual punishment. If the injury has healed by the time suit begins, nothing other than damages could be a "remedy," and if the administrative process cannot provide compensation then there is no administrative remedy to exhaust. Perez ... alleges that his medical problems are ongoing and that his treatment remains deficient, so Wisconsin can provide him with some "remedy" whether or not its administrative process offers damages.

*Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532, 538 (7th Cir.1999).[2]

---

**2.** The Seventh Circuit also required in that case that inmates exhaust their administrative

Decisions after *Booth* have reached similar conclusions. In one case, an inmate filed a suit alleging that a correctional officer failed to protect him from a cell mate who beat and sexually assaulted him. *See Nitz v. Correctional Officer French*, 2001 WL 747445 (N.D.Ill. July 2, 2001). The inmate filed an administrative grievance seeking relief from the threatening situation and was later transferred to another prison while his grievance was pending. *Id.* at *3. The inmate never pursued his grievance after his prison transfer. *Id.* The defendant sought to dismiss the inmate's civil rights complaint, arguing that because the inmate had not pursued his grievance to the highest possible level of the administrative process he had not exhausted his administrative remedies. The court rejected that argument, noting that once the inmate was transferred to another prison "he had received all the 'relief' that administrative procedures could give." *Id.* The court noted that to require otherwise would lead to absurd results. "It would be a strange rule that an inmate who has received all he expects or reasonably can expect must nevertheless continue to appeal, even when there is nothing to appeal." *Id.*

In another case, an inmate filed a suit alleging that the prison medical staff were deliberately indifferent in treating and providing him information about hepatitis C. *See Gomez v. Winslow*, 177 F.Supp.2d 977 (N.D.Cal.2001). He filed a grievance seeking not only interferon treatment for his hepatitis but also medical information on how the interferon would affect his other medical conditions. *Id.* at 979. Just prior to his grievance being heard at the second formal level of review, the inmate was provided the medical information that he requested and soon thereafter began receiving interferon treatments. *Id.* at

979–980. This change in conditions prompted the prison appeals coordinator to partially grant the inmate's appeal. The inmate did not pursue his appeal after this partial grant. *Id.* at 980. The defendants later filed a motion to dismiss the complaint, asserting that the inmate's failure to appeal his grievance to the director for the Department of Corrections (that is, to the third, and last, formal level of review) demonstrated that he had not exhausted his administrative remedies. The court rejected this argument, noting that "because [the inmate] had, in essence, 'won' his inmate appeal, it would be unreasonable to expect him to appeal that victory before he is allowed to file suit." *Id.* at 985.

■ The facts in this case are not unlike those in *Nitz* and *Gomez*. Brady, like the inmates in *Nitz* and *Gomez*, sought through his grievance that certain actions be taken by prison officials, namely, that he be seen by an outside eye specialist. During the pendency of his grievance, Brady similarly received the action he sought. This action on the prison officials part in turn short-circuited the consideration of his grievance. Just as in *Gomez*, Brady's appeal was granted at a lower level of the administrative process precisely because he had received the medical treatment he requested in his grievance. When Brady's grievance was "granted" at the second level of review, there was little else he could seek or expect from the prison administrative process; he had "won" his appeal and had been granted all the relief he sought in his grievance. Nowhere have the defendants articulated what other types of relief were still available from the administrative process for Brady to pursue after his appeal was granted. Nor does it appear that any in fact do exist. California's grievance

---

remedies even when the grievance process did not provide for monetary relief well before the Supreme Court required the same in *Booth*. *See* 182 F.3d at 537.

process only requires an inmate to appeal to the director if their "appeal [is] not resolved at [the] second level." CAL. CODE REGS. tit. 15, § 3084.5(d). Because Brady's appeal was granted at the second level, the Department of Corrections' own regulations would appear to indicate that further exhaustion on his part was not required. "Without the possibility of some relief" remaining available, *Booth* mandates a finding that Brady has exhausted his administrative remedies. 121 S.Ct. at 1822 n. 4.

The defendants, however, contend that other courts have required such exhaustion under similar circumstances. In particular, they direct this Court's attention to an *unpublished* decision from the Northern District of California, *Long v. Gomez*, No. C 98–02679 SBA (N.D.Ca. Jan. 3, 2002), for support. According to the defendants this unpublished decision shows that "[t]he Northern District has addressed this issue .... " (Def's Mot. Recons. at 5). Apparently, defendants are unaware of the district court's decision in *Gomez v. Winslow*, an earlier, *published* decision from the same district that is to the contrary. Be that as it may, the Court does not find the decision in *Long* particularly persuasive.

In that case, the inmate requested in his grievance for an investigation into him being shot by a prison guard. This request was later granted at a lower level in the administrative process. The inmate was apparently satisfied with this result and did not further pursue his appeal. This lack of action prompted the court to find that the inmate had not exhausted his administrative remedies. The court noted at the outset that, "[s]o long as the administrative system can provide *some* redress, the plaintiff must pursue his claims through that system until they can be pursued no further." *Id,* slip op. at 12. From this the Court then leaped to the conclusion that the inmate did not exhaust his

remedies because "he did not appeal to the final administrative level." *Id.* Nowhere does the court explain why such a conclusion is mandated by the inmate's simple failure to appeal after winning at a lower administrative level. The court does not identify what "redress," if any, still remained for the prison to provide after it agreed to investigate the shooting. Such an omission is particularly striking given that the court itself stated that exhaustion is only required so long as "some redress" can be provided. The court did, however, opine that were it to hold otherwise it would circumvent the policies underlying § 1997e(a)'s exhaustion requirement. This argument simply does not hold up under scrutiny.

The Supreme Court noted that one of the purposes for the exhaustion requirement was to force an inmate to go through the administrative process so as to give prison officials an opportunity to take corrective action that would keep the inmate from filing a lawsuit. *See Porter,* 534 U.S. at ——, 122 S.Ct. at 988 ("In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation"); *Booth,* 121 S.Ct. at 1823 ("exhaustion in these circumstances would produce administrative results that would satisfy at least some inmates who start out asking for nothing but money, since the very fact of being heard and prompting administrative change can mollify passions even when nothing ends up in the pocket"). If an inmate was forced to continue pursuing an appeal even after prison officials took the corrective action sought in his grievance, there arises the very real possibility of negative action being taken on the inmate's appeal at a later stage in the administrative process. If, for example, the inmate in *Nitz* continued to pursue his appeal, it is plausible that the earlier deci-

sion to transfer him to another prison might have been reversed and the inmate placed back in the cell with the inmate who beat him. The court in *Long* in fact recognized such a possibility: "Appealing a satisfactory response in general risks the possibility that the higher levels of review will reverse the lower level response; thus leaving the [inmate] in a worse position than had he not appealed." *Long,* No. C 98–02679, slip op. at 12.

Construing § 1997e(a) to mandate that an inmate continue to appeal even after obtaining all the relief he can extract from the prison administrative process therefore undercuts one of the very policies underlying it: To allow prison officials an opportunity to take corrective action so as to satisfy the inmate and perhaps prevent the filing of a lawsuit. Continuing to appeal even after winning at a lower administrative level will not give the inmate anymore than what he already has obtained. Instead it will only provide the opportunity that the corrective action taken earlier (which may have kept the inmate from later filing suit) will later be undone.

Instead, both common sense and the Supreme Court's decision in *Booth* require a finding that Brady exhausted his administrative remedies after his appeal was "granted" at a lower level in the administrative process.

Since filing his Notice, Brady has filed a copy of his proposed amended complaint and a motion for leave to file said complaint. The Court hereby **GRANTS** Brady's motion for leave to file his amended complaint.